

**FILED**

DEC 1 1 2013

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| FRED JOHNSON, | * | CIV 11-4032 |
| Petitioner, | * | |
| -vs- | * | REPORT and RECOMMENDATION |
| DARIN YOUNG,[1] Warden; and<br>MARTY JACKLEY, Attorney General,<br>State of South Dakota, | * | |
| Respondents. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Petitioner, Fred Johnson ("Johnson"), an inmate at the South Dakota State Penitentiary, has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) pursuant to 28 U.S.C. § 2254. The Respondent has filed its Answer (Doc. 13) along with an accompanying Brief and attachments (Doc. 14). Johnson filed a Reply to the Respondent's Answer (Doc. 15). Johnson also filed supplemental authority (Doc. 16). Respondent also filed the pertinent original state court records, along with transcripts of Johnson's jury trial and the state habeas evidentiary hearing. The matter is now ripe for decision.

## JURISDICTION

The pending matter was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and Judge Schreier's Standing Order dated March 18, 2010.

---

[1]Darin Young became the Warden of the South Dakota State Penitentiary on May 24, 2013. He has been substituted as the named Defendant in this action pursuant to Fed. R. Civ. P. 25(d).

## FACTUAL BACKGROUND[2]

Fred Johnson and Cassandra Breen were involved in a rocky romantic relationship. It deteriorated shortly after their son (J.B.) was born. Cassandra and J.B. moved in with Cassandra's parents in rural Baltic, South Dakota. Johnson moved in with his ex-wife Sheila, their three children, and his two nieces in Monroe, South Dakota.

On the morning of September 30, 2004, Cassandra had to leave by 6:30 a.m. in order to be to work by 7:00. Cassandra's parents had already left for work. She placed J.B., strapped in his car seat, in the back seat of her SUV. Johnson pulled up behind her and blocked her vehicle. JT II 53. Johnson pulled her car door open and yelled, "listen here bitch, no one is going to take my son away." JT II at 53-54.[3] The next thing Cassandra remembers is waking up in the hospital. *Id.* She remained in the hospital until January 4, 2005. JT II at 55.

Two passers by noticed Cassandra's vehicle at the end of the driveway with the door open and stopped to investigate.[4] They found Cassandra lying over the console with her leg hanging out the driver's side door and her head in the passenger's seat. J.B. was still strapped in his car seat in the back. The passers by called for help. An EMT arrived on the scene. Cassandra told the EMT that Fred hit her in the head with a hammer. JT II at 93. The first law enforcement officer on the scene (Detective Tommeraasen) asked Cassandra the last name of her assailant. She said

---

[2]The facts which are most pertinent to the issues raised by Johnson are summarized and are gathered from the State court criminal file, CR 04-5137, Second Judicial Circuit, Minnehaha County, South Dakota, from the published opinion disposing of Johnson's direct appeal, *State v. Johnson*, 739 N.W.2d 1 (S.D. 2007), and from the various transcripts contained in both the original criminal and habeas files which have been thoroughly reviewed by the Court. References to the transcript of the jury trial will be by "JT" followed by the appropriate volume and page number. References to the transcript of the state habeas hearing will be by "HT" followed by the appropriate date and page number. References to transcripts of various other hearings will be by the specific hearing, date and page number. References to the settled record from the underlying criminal file will be by "SR" followed by the appropriate page number.

[3]Shortly before the morning of September 30, Cassandra called Johnson to tell him that visitation with their son would be limited to one hour at a time in public places. JT II at 51. She testified at trial that Johnson agreed but was not happy about this arrangement. *Id.*

[4]The passers by were Garretson school teachers who car-pooled and regularly passed the Breen home between 6:45 and 7:00 a.m. each morning. JT II at 75-76.

"Johnson."[5]   JT II at 100.   Upon examination at the hospital, medical personnel discovered Cassandra had not be hit in the head with a hammer, but had been shot in the head.  Dr. Bryan Wellman, Cassandra's neurosurgeon, explained at trial that the bullet entered her forehead, traveled through each lobe on the right side of her brain, and left fragments lodged throughout her brain.  JT III at 44.  Dr. Wellman removed most of the fragments, but one large fragment remains in Cassandra's brain because it is too dangerous to remove.  *Id.* at 45.  Cassandra sustained permanent physical injuries including left-sided paralysis of her arm and foot.  JT III 48-49.

On the morning of Cassandra's shooting, Turner County Sheriff Byron Nogelmeier went to Johnson's home in Monroe, South Dakota.  He found Johnson and Johnson's three young children there at approximately 8:15 a.m.  JT II 166-168.  Johnson was hanging clothes on a clothesline in the backyard when Nogelmeier arrived.[6]  Nogelmeier had been instructed by the Minnehaha County Sheriff's office to arrest Johnson, but Johnson persuaded Nogelmeier that, because he was without a vehicle that was operable, he'd been home all morning and could not have committed the crime.  JT II at 170.  Johnson agreed to accompany Nogelmeier to the Turner County Sheriff's office to meet with the Minnehaha County Sheriff personnel to get the matter ironed out.  JT II at 170.  The children came along and rode in the patrol car.  *Id.* at 171.  Shortly thereafter Johnson's ex-wife arrived to retrieve the children.  *Id.* at 172.

Johnson agreed to speak with Minnehaha County Sheriff's Department Phillip Toft when Toft arrived at the Turner County Sheriff's Department.  The interview was video recorded.  Toft described Johnson as calm and cooperative.  Johnson offered several reasons why he could not have

---

[5]Cassandra also identified her boyfriend as the assailant to medical personnel after she was transported to the hospital.  JT III at 39.

[6]A pair of Tommy Hilfiger jeans, size 38x32 were later seized from the laundry basket near the clothes line pursuant to a search warrant.  JT II at 185.  The jeans tested positive for gunshot residue on the front right pocket/ upper thigh area .  JT III at 166.  Gunshot residue was also found on the back of Johnson's right hand.  There was no residue found on his left hand or on the palm of his right hand.  JT III at 155.  The State's expert (Martinez) concluded that Johnson "may have discharged a firearm, handled a discharged firearm, or was in close proximity to a discharged firearm."  *Id.* at 160.  He estimated the ideal window for gunshot residue testing to be within three but probably not more than twelve hours from the time of contact with the firearm.  *Id.*  The DCI Agent who performed the gunshot residue test indicated it was performed at 3:35 p.m on September 30.  JT III at 112.

shot Cassandra. He indicated he'd been with his ex-wife Sheila the night before and earlier that morning, and that Sheila was in possession of their only viable means of transportation, a Chevy Lumina. Johnson initially claimed Sheila was driving the Lumina when it ran out of gas near Lake Vermillion, but eventually claimed he was driving the Lumina when it ran out of gas the previous evening. *Id.* at 124. Eventually, Johnson admitted he was driving the Lumina and that it ran out of gas near lake Vermillion on the morning of the shooting. JT II at 131. He called his ex-wife Sheila to come get him and take him back to the house in Monroe. *Id.* at 131-132.

When she was interviewed Sheila explained Johnson had not been with her and that Johnson, not Sheila was in possession of the couple's only viable means of transportation the previous night and early that morning. JT II at 121-123. Sheila also told varying stories before admitting she had stayed overnight in Sioux Falls with her sister and nieces the night of September 29th. JT IV 30-31. She was at her sister's house in Sioux Falls when she received a call from Johnson on the morning of the 30th. JT IV at 25. He told her he'd run out of gas and needed her to come pick him up. *Id.* When she arrived to pick him up, the children were not with Johnson; they were home alone. *Id.* Sheila claimed she initially lied to law enforcement because she did not want anyone to get in trouble for leaving the children home alone. *Id.* at 28. When Johnson called her at approximately 7:15 a.m. on September 30, Sheila took her sister's car, left Sioux Falls, picked Johnson up, and they left the Lumina near Lake Vermillion. Sheila returned Johnson to the house in Monroe. Sheila then returned to Sioux Falls by 8:15, where she dropped her nieces off at school and her sister at work. JT IV at 7-8.

Eventually Toft asked Johnson if he would be willing to go to the Minnehaha County Sheriff's office to take a polygraph test and a gunshot residue test. Johnson agreed. Suppression Hearing Transcript dated January 5, 2005 (ST) at 39. Toft described Johnson as articulate and a "smooth talker." *Id.* The Sioux Falls interview was also video taped and was preceded by a *Miranda* warning. *Id.* at 45. Johnson told Detective Toft that he'd taken Celebrex or Darvocet for pain, but Toft did not perceive that Johnson was impaired in any way during the interviews. *Id.* at 50. Johnson appeared coherent and intelligent. *Id.* Johnson was placed under arrest at approximately 4:15 p.m. on September 30, 2004. Other pertinent facts will be discussed as they become relevant to Johnson's various grounds for federal habeas relief.

4

## PROCEDURAL HISTORY

On October 13, 2004, a Minnehaha County grand jury indicted Johnson on Five Counts: Count 1 charged Johnson with attempted murder in the first degree, Count 2, 3 & 4 all charged aggravated assault, and Count 5 charged the commission or attempt to commit a felony with a firearm. All Counts charged acts occurring on September 30, 2004. (*State v. Johnson*, *Minnehaha County, South Dakota, Second Judicial Circuit*, CR 04-5137*)*. A Part II Information was also filed, charging Johnson as a habitual offender. A jury trial commenced on June 20, 2005. On June 24, 2005 the jury found Johnson guilty of all counts. On September 7, 2005, the Honorable Glen Severson, Circuit Court Judge for the Second Judicial Circuit, Minnehaha County, South Dakota, sentenced Johnson to: Count 1: attempted murder in the first degree: twenty-five years imprisonment; Count 4: aggravated assault: fifteen years imprisonment, consecutive to Count 1; Count 5: commission or attempt to commit a felony with a firearm: twenty-five years imprisonment, consecutive to Count 4.[7]

Johnson raised the following issues on direct appeal:

1. Whether the trial court erred when it found that a conviction and sentence for attempted murder and aggravated assault was not a violation of Johnson's double jeopardy?

2. Whether the trial court erred when it denied Johnson's motion to suppress the statements he made to law enforcement on September 30, 2004?

3. Whether the trial court erred when it limited Johnson's cross-examination of Breen?

On August 15, 2007, the South Dakota Supreme Court affirmed Johnson's conviction. (*State of South Dakota v. Johnson*, 739 N.W.2d 1 (S.D. 2007)). On June 11, 2008, Johnson filed a *pro se* petition for writ of habeas corpus in state court. *See* Civ. No. 08-2677, Second Judicial Circuit, Minnehaha County. His court-appointed counsel filed an amended state habeas petition on April 24, 2009. Johnson raised the following issues in his amended state habeas petition:

1. Petitioner's counsel provided ineffective assistance of counsel by failing to investigate and offer during the trial, potential evidence showing the victim's

---

[7]Johnson was convicted on the Count 2 and 3 aggravated assault charges but Judge Severson imposed no sentence on those Counts because he deemed them the same offense as the Count 4 charge. The Habitual Offender Information was dismissed.

animosity towards petitioner and phone contacts with Petitioner's family members before and up to the trial in this matter, showing motive for untruthful testimony on the part of the victim and/or actual dishonesty by the victim, and other specific evidence as requested by Petitioner such as the testimony from persons who Petitioner spoke with the morning of the incident which formed the basis for the underlying criminal charge, in violation of Petitioner's 6th Amendment right of effective assistance of counsel.

2.      Petitioner's counsel provided ineffective assistance of counsel by failing to move the court for a continuance of the trial in order to allow Petitioner's expert witness to testify at the trial in this matter regarding evidence of gunshot residue found on items of property owned by Petitioner in violation of Petitioner's 6th Amendment right to effective assistance of counsel.

3.      Petitioner's counsel provided ineffective assistance of counsel by [in]effectively investigating and challenging the State's assertion that Petitioner was wearing a certain pair of pants during the day in which the victim was shot even though Petitioner denied that he wore those pants on the day in question.

4.      That the prosecuting attorney, the Minnehaha County States Attorney's office, along with the Minnehaha County Sheriff Department, violated Petitioner's 6th Amendment right to a fair trial, by giving favorable treatment to the victim when she was stopped while in the presence of illegal narcotics, and an individual who was arrested with illegal narcotics, shortly before trial to bolster the credibility of the State's witness.

5.      That Judge Severson committed error when he refused to replace Petitioner's trial attorney even after there existed much evidence of the inability of Petitioner and trial counsel to work together effectively.

6.      That Judge Severson committed error when he refused to move the trial to a different venue in the face of extensive pre-trial pollution of the jury pool by local media, and Minnehaha County Sheriff's Department.

7.      That Petitioner's Appellate counsel was ineffective in that he failed to bring up Petitioner's medications and the effect they had on Petitioner during the interviews of Petitioner on the first day of the investigation in the crime which formed the basis for the underlying indictment in the criminal file.

8.      That the above violations by Petitioner's appointed counsel violated Petitioner's Due Process rights and fair trial rights secured to him by Article VI, §§ 2 and 7 of the South Dakota Constitution, and the 5th, 6th, and 14th Amendments to the Constitution of the United States, in addition to other violations specifically mentioned above.

9.    That Petitioner's double jeopardy rights were violated when he was convicted and sentenced for both the Attempted Murder and Aggravated Assault charges in violation of Article VI, § 9, and his 5th Amendment right against double jeopardy.

Evidentiary hearings were held on August 21, 2009 and January 29, 2010. Three witnesses testified at the state habeas hearings: Fred Johnson, Sheila Johnson and Johnson's trial counsel, Cynthia Howard. One exhibit was received into evidence. On November 12, 2009 Judge Kathleen Caldwell issued a Memorandum Opinion denying the Petition. Judge Caldwell filed Findings of Fact, Conclusions of Law and an Order denying the Writ on July 14, 2010. Judge Caldwell denied Johnson's Motion for Certificate of Probable Cause on July 27, 2010. On February 25, 2011, the South Dakota Supreme Court denied Johnson's Motion for Certificate of Probable Cause.

Johnson timely filed his federal habeas Petition pursuant to 28 U.S.C. § 2254. Johnson raises the following issues in his federal Petition:

1.    Petitioner's rights guaranteed under the 5th Amendment against double jeopardy were violated. Applicable to State through 14th Amendment. Petitioner was charged with attempted murder and three counts of aggravated assault and one count of commission of a felony while armed with a firearm. The jury convicted Petitioner and Petitioner was sentenced for attempted murder, one count of aggravated assault and commission of a felony while armed with a firearm. The intent to commit attempted murder and aggravated assault are diametrically opposed and the enhancement does not identify the primary charge. The same evidence proved all elements of the separate counts.

2.    Petitioner received ineffective assistance of counsel in violation of the 6th Amendment made applicable to the states through the 14th Amendment. Trial counsel failed to investigate impeachment witnesses against the victim. Trial counsel failed to seek a continuance so that expert witness would be available to rebut State's version of scientific evidence. Trial counsel failed to object to a pair of pants allegedly worn by Petitioner on the date of the crime without foundation.

3.    Petitioner was not granted a fair trial because the Court refused to grant a change of venue. The publicity was extensive. The Sheriff made public speeches in the town concerning the Petitioner's guilt.

4.    Petitioner was denied effective assistance of counsel on direct appeal in violation of the 6th Amendment and 14th Amendment. Counsel failed to properly advise Petitioner concerning appeal and habeas corpus. Failed to argue that Petitioner's medications had a substantial effect on Petitioner's lucidity during questioning and

interviews as to render the statements involuntary and unknowingly made. Detectives knew Petitioner was on Celebrex which affect lucidity.

## ANALYSIS

A state prisoner who believes he is incarcerated in violation of the Constitution or laws of the United States may file a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The federal courts are constrained, however by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), to exercise only a "limited and deferential review of underlying state court decisions." *Osborne v. Purkett,* 411 F.3d 911, 914 (8th Cir. 2005). A federal court may not grant a writ of habeas corpus unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal habeas court may not issue the writ merely because it concludes the state court applied the clearly established federal law erroneously or incorrectly. *Id.* at 411, 120 S.C. at 1495. "Rather, that application must also be *unreasonable*." *Id.* (emphasis added).

The state court's factual findings are presumed to be correct, and a federal habeas court may not disregard the presumption unless specific statutory exceptions are met. *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir. 1998); 28 U.S.C. § 2254(e). A federal habeas court "may not simply disagree with the state court's factual determinations. Instead it must conclude that the state court's findings lacked even fair support in the record." *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.C. 843, 850, 74 L.Ed.2d 646 (1983).

Finally, both the United States Supreme Court and the Eighth Circuit have noted federal review of ineffective assistance claims in § 2254 petitions is particularly deferential: "When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel . . .our cases require that the federal court use a 'doubly deferential' standard of review that gives both the

state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S.Ct. 10, 13, 2013
WL 5904117 at * 3. (2013). "Our review under 28 U.S.C. § 2254 of a state court's application of
*Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.C. 2052, 80 L.Ed.2d 674 (1984) is twice
deferential: we apply a highly deferential review to the state court decision; the state court, in turn,
is highly deferential to the judgments of trial counsel." *Nooner v. Norris*, 402 F.3d 801, 808 (8th Cir.
2005). Johnson's claimed grounds for relief stated in his § 2254 application are discussed below:[8]

> **Petitioner's First Ground For Relief: Petitioner's rights guaranteed under the**
> **5th Amendment against double jeopardy were violated.  Applicable to State**
> **through 14th Amendment. Petitioner was charged with attempted murder and**
> **three counts of aggravated assault and one count of commission of a felony**
> **while armed with a firearm. The jury convicted Petitioner and Petitioner was**
> **sentenced for attempted murder, one count of aggravated assault and**
> **commission of a felony while armed with a firearm.  The intent to commit**
> **attempted murder and aggravated assault are diametrically opposed and the**
> **enhancement does not identify the primary charge.  The same evidence proved**
> **all elements of the separate counts.**

This claim was decided by the South Dakota Supreme Court on Johnson's direct appeal.
*State v. Johnson*, 739 N.W.2d 1 (S.D. 2007). There, as here, Johnson argued  a single act resulted
in his convictions for attempted murder and aggravated assault.  He urged that because the South
Dakota legislature expressed no intent to impose punishment for both the offenses, his constitutional
right against double jeopardy was violated.  *Id.* at 6.


Johnson was convicted of and sentenced for aggravated assault and attempted murder.  Those
two crimes are defined under South Dakota law as follows:


**SDCL 22-18-1.1.  Aggravated Assault–Felony**
Any person who:

(1) Attempts to cause serious bodily injury to another, or causes such injury, under
circumstances manifesting extreme indifference to the value of human life;

---

[8]For convenience, Johnson's claims are re-arranged so  his ineffective assistance claims can
be discussed together.

(2) Attempts to cause; or knowingly causes, bodily injury to another with a dangerous weapon;

(3) [deleted]

(4) Assaults another with intent to commit bodily injury which results in serious bodily injury;

(5) Attempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm;

(6) [deleted]

(7) Intentionally or recklessly causes bodily injury to an infant, less than three years old, by causing intra cranial or intra ocular bleeding, swelling of or damage to the brain, whether caused by blows, shaking, or causing the infant's head to impact with an object or surface;

is guilty of aggravated assault. Aggravated assault is a Class 3 Felony. However, a violation of Subdivision (7) is a Class 2 felony. A second or subsequent violation of Subdivision (7) is a Class 1 felony.

### SDCL 22-4-1.  Attempt-Punishment.

Unless specific provision is made by law, any person who attempts to commit a crime and, in attempt, does any act toward the commission of the crime, but fails or is prevented or intercepted in the perpetration of that crime, is punishable for such attempt at maximum sentence at one-half the penalty prescribed for the underlying crime. However, any person who attempts to commit a Class A, Class B, or Class C felony is guilty of a Class 2 felony.

### SDCL 22-16-4.  Homicide as murder in the first degree.

Homicide is murder in the first degree:

(1) If perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being, including an unborn child; or

(2) If committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing, or discharging of a destructive device or explosive.

Homicide is also murder in the first degree if committed by a person who perpetrated, or who attempted to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing or discharging of a destructive device or explosive and who subsequently effects the death of any victim of such crime to prevent detection or prosecution of the crime.

The South Dakota Supreme Court considered, but rejected Johnson's double jeopardy claim. The Court first determined the legislative intent of the applicable statutes was uncertain. *State v. Johnson*, 739 N.W.2d 1, 7 (S.D. 2007). Because the legislative intent was uncertain, the Court employed the *Blockburger*[9] analysis. *Id.* Applying the *Blockburger* analysis, the Court determined:

> Attempted murder requires the perpetrator (1) to attempt to kill a human being with (2) 'a premeditated design to effect death.' SDCL 22-16-1; SDCL 22-16-4; SDCL 22-4-1. Aggravated assault does not required a premeditated design to effect death. It does, however, require the victim to suffer 'serious bodily injury.' SDCL 22-18-1.1(4). Suffering 'serious bodily injury' is not an element of attempted murder. Attempted murder only requires a premeditated design to effect the death of the victim and some act toward its commission. Although in some cases the required act toward committing the murder may result in serious bodily injury, it is not a statutory element of attempted murder. One can envision situations in which one could be convicted of attempted murder without any injury to the intended victim, for example shooting at someone and missing. Consequently, we must conclude that each offense requires proof of a fact which the other does not. In other words, aggravated assault requires proof of the statutory element of 'serious bodily injury' while attempted murder does not. One is not subsumed into the other as a lesser included offense.
> ***
> While there is no explicit language that authorizes or prohibits punishment for both attempted murder and aggravated assault arising from a single transaction, under the analysis set forth in *Blockburger v. United States*, Johnson's double jeopardy claim fails. Both the offense of attempted murder and the offense of aggravated assault require proof of an element the other does not. Thus, Johnson's right against double jeopardy was not violated by being convicted and sentenced to aggravated assault and attempted murder.

*State v. Johnson*, 739 N.W.2d 1, 8 (S.D. 2007). The manner in which double jeopardy claims are decided in the federal courts is well-established:

> The Double Jeopardy Clause of the Fifth Amendment declares: '[N]or shall any person be subject for the same offence to be twice put in jeopardy of life and limb . . . .' U.S. Constitution, amend. V. Under this clause, a defendant is protected from both successive prosecutions and multiple punishments for the same criminal offense. . . .In order to support a claim of double jeopardy, a defendant must show that the two offenses charged are in law and fact the same offense.

*United States v. Bennett*, 44 F.3d 1364, 1368 (8th Cir. 1995) (citations omitted, punctuation altered).

"With respect to cumulative sentences imposed in a single trial, the Double Jeopardy clause does

---

[9]*Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed.2d 306 (1932).

no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). To determine whether crimes are the same for double jeopardy purposes, the Courts apply the *Blockburger* or the same elements rule as articulated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed.2d 306 (1932). If each offense requires proof of an element not required by the other, the crimes are not considered the same, and a double jeopardy challenge fails. *United States v. Good Bird*, 197 F.3d 1203, 1204 (8th Cir. 1999).

The Eighth Circuit has given specific direction to the district courts about the scope of review given a double jeopardy claim which is based on state law and which has already been determined by the state courts. "Under AEDPA, a federal court can grant habeas relief from a state court judgment only if that judgment was contrary to, or involved an unreasonable application of clearly established *Federal* law. 28 U.S.C. § 2254(d)(1). It is not the province of a federal court to reexamine state-court determinations on state-law questions. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)." *Dodge v. Robinson*, 625 F.3d 1014, 1019 (8th Cir. 2010) (emphasis in original). In *Dodge* an Iowa inmate brought a § 2254 habeas claim, asserting double jeopardy based on his consecutive state sentences for (1) manufacturing methamphetamine and (2) possession of the ingredients with intent to manufacture methamphetamine. The Iowa state courts rejected the double jeopardy claim. The Eighth Circuit explained:

> Where the legislature intends to impose multiple punishments, imposition of such sentences does not violate the Constitution. Rather *Blockburger* is simply a rule of statutory construction. This distinction is critical to the disposition of this case, because where, as here, a defendant challenges cumulative punishment imposed for violations of state law, whether this cumulative punishment is authorized by the legislature is a question of state law.

> The Supreme Court repeatedly has held, in the double-jeopardy context, that whether a state legislature intends cumulative punishment for two offenses is an issue of state law, over which state courts have final authority. ***

> In this case, Dodge's double-jeopardy claim turns on whether the Iowa legislature intended to impose cumulative punishment for the violation of . . .manufacture of methamphetamine and . . .possession of pseudoephedrine with intent to manufacture methamphetamine . . .Both of the Iowa Courts that addressed this question on the merits answered in the affirmative. On direct appeal, the Iowa Court of Appeals,

12

applying *Blockburger*, held that the legislature intended to authorize cumulative punishment because "each offense of which Dodge was convicted contained an element not found in the other."  . . .

We are bound by the Iowa courts' interpretation of Iowa law.***

***Since we are bound by the Iowa courts' determination that the Iowa legislature intended cumulative punishment for these offenses, we cannot reject the constitutional conclusion that necessarily follows: no double jeopardy violation occurred in this case. ***

*Dodge v. Robinson*, 625 F.3d 1014, 1018-19 (8th Cir. 2010) (punctuation altered, citations omitted).

The South Dakota Supreme Court considered, but rejected Johnson's double jeopardy argument  because it determined aggravated assault and attempted murder were separate offenses pursuant to *Blockburger*.  It concluded SDCL § 22-18-1.1 (aggravated assault) and SDCL § 22-4-1 /22-16-4(attempted murder) each  "[require] proof of additional facts which the other does not." This Court is bound by the South Dakota court's determination that the South Dakota legislature intended cumulative punishment for aggravated assault and attempted murder . As such this Court "cannot reject the constitutional conclusion that necessarily follows: no double jeopardy violation occurred in this case." *Dodge*, 625 F.3d at 1019.

The state court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law.  It is therefore respectfully recommended to the District Court that Johnson's First Claim for Relief be DENIED.

**Petitioner's Second Claim For Relief:  Petitioner received ineffective assistance of counsel in violation of the 6th Amendment made applicable to the states through the 14th Amendment.  Trial counsel failed to investigate impeachment witnesses against the victim.  Trial counsel failed to seek a continuance so that expert witness would be available to rebut State's version of scientific evidence. Trial counsel failed to object to a pair of pants allegedly worn by Petitioner on the date of the crime without foundation.**

This claim contains several sub-parts.  Johnson raised each sub-claim  at the state court level and each was addressed by Judge Caldwell in her Findings of Fact and Conclusions of Law.  All of Johnson's claims are governed by the same principle of law.  To establish an ineffective assistance

of counsel claim, Petitioner must (1) establish counsel's representation fell below an objective standard of reasonableness and (2) show the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.C. 2052, 80 L.Ed.2d 674 (1984). To demonstrate prejudice, Johnson must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694, 104 S.C. at 2052. The Court must begin by presuming trial counsel was effective, and strategic choices are entitled to great deference. *Boyd v. Minnesota*, 274 F.3d 497, 502 (8th Cir. 2001). In considering ineffective assistance claims, the Court addresses not what is prudent or appropriate, but only what is "constitutionally compelled." *Whitmore v. Lockhart*, 8 F.3d 614, 631 (8th Cir. 1993) (citation omitted). Johnson must show more than his trial counsel's alleged error had "some conceivable effect on the outcome of the proceeding because not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id. quoting Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067.

The Eighth Circuit has noted federal review of ineffective assistance claims in § 2254 petitions is particularly deferential: "Our review under 28 U.S.C. § 2254 of a state court's application of *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.C. 2052, 80 L.Ed.2d 674 (1984) is twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." *Nooner v. Norris*, 402 F.3d 801, 808 (8th Cir. 2005). Johnson's sub-claims are discussed separately below:

### (1)    Investigation of Potential Impeachment Witnesses.

Johnson wanted his trial counsel to call more witnesses to testify at his criminal trial. Johnson claimed he saw two of his neighbors on the morning of Cassandra's shooting. HT (8-21-09) at 47. Counsel explained why the two neighbors Johnson believed might be able to provide an alibi never came to fruition. Johnson claimed he saw one woman in the alley in Monroe on the morning of the shooting. He did not speak with her and it is unclear whether he believed she saw him. Counsel's investigator was unable to locate the woman but left his card with the woman's husband and asked that the wife please call. She was uncooperative. HT (1-29-2010) at 19. Johnson told counsel he spoke with another woman (Alice Lindeek) in Monroe on the morning of

14

the shooting. Ms. Lindeek told police she slept in that morning and did not get out of bed until 8:00 a.m.–after the crucial time frame. Nevertheless, counsel's investigator also attempted to contact Ms. Lindeek, who was also uncooperative. HT (1-29- 2010) at 19. Johnson also urged trial counsel to interview people and introduce evidence into trial about the stormy relationship between Cassandra and Johnson. HT (1-29-10) at 20. He wished to introduce evidence about their prior arguments and fights, and the earlier police reports she filed against him. *Id.* HT (8-21-09) at 19-20, 74-76. Counsel never really understood why Johnson wanted that information to come into evidence, other than perhaps to show that Cassandra had filed police reports against him in the past and that when she recanted or failed to show up for court, it suggested Cassandra was untruthful. *Id.* at 20.

Trial counsel testified that between her and co-counsel, they spent 221 hours out-of-court preparing Johnson's case and 71 hours in-court. HT (1-29-2010) at 12. The office investigator spent 65 hours on the case. An outside investigator spent 18 hours on the case. *Id.* The investigators spoke with approximately 20 people. *Id.* at 13. They never found anyone else with a motive to harm Cassandra. HT (1-29-10) at 21. Trial counsel explained she did not believe that introducing evidence of any sort about Johnson and Cassandra's previous rocky relationship was a good trial strategy. *Id.* at 13. She thought that because Johnson was accused of shooting Cassandra in the head, introducing evidence of a history of domestic violence between the two would "probably do a lot of damage" to Johnson's case. *Id.* at 14. She thought, in fact, it would be a "horrible strategy." *Id.*

In her Findings of Fact and Conclusions of Law, Judge Caldwell found counsel was not ineffective for failing to introduce the impeachment evidence urged by Johnson. *See* Doc. 13-9, EX J. Judge Caldwell noted counsel and her staff's time spent working on Johnson's case and following up on leads provided by Johnson. *Id.* Findings of Fact Nos. 18-21. Judge Caldwell cited *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984) as the applicable legal standard. *Id.*, Conclusion of Law No. 1. She found Johnson's proposed trial strategy of purposely introducing into evidence previous incidents of discord between Johnson and Cassandra would have been detrimental, not helpful, to Johnson's case. *Id.*, Conclusion of Law No. 9. Judge Caldwell concluded, "this Court finds that Johnson has not proven

15

by a preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness as to the investigation issue or that Johnson was prejudiced . . ." *Id.,* Conclusion of Law No. 10.

Federal courts may not second guess counsel's reasonable strategic decisions, as they are virtually "unchallengeable." *Cole v. Roper*, 623 F.3d 1183, 1191 (8th Cir. 2010). A state habeas petitioner cannot show ineffective assistance for failure to call witnesses in the absence of showing the uncalled witnesses would have actually testified, and that their testimony would have been favorable. *Lawrence v. Armontraut*, 900 F.2d 127, 130 (8th Cir. 1990). Under the AEDPA the federal court "must give substantial deference to the state court's predictive judgment. So long as the state court's decision was not contrary to clearly established law, the remaining question under the unreasonable application cause of § 2254(d) is whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citations omitted, punctuation altered). The state court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that this portion of Johnson's Second Ground for Relief be DENIED.

### (2)    Failure to Seek a Continuance to Allow Johnson's Expert to Testify

Next, Johnson asserts that when the gunshot residue expert trial counsel hired to testify had a conflict with his trial date, trial counsel should have requested a continuance rather than proceed to trial in the absence of expert testimony. Johnson testified during the state habeas proceeding that he would have agreed to a continuance if counsel had requested one. HT (8-21-09) at 24. Counsel assured him that the expert provided her with questions to ask the state's expert, but Johnson did not believe counsel was qualified to proceed in that manner. *Id.* at 23.   Johnson admitted he was not sure how the gunshot residue expert would have helped his case. *Id.* at 70.

Counsel explained she hired a gunshot residue expert. HT (1-29-10) at 14. She considered having him testify at trial. *Id.* The trial was delayed, however and the expert was not available the week the trial was finally set. *Id.* at 15. Counsel decided to proceed to trial without the expert rather

16

than request a continuance. She cited three reasons: She believed she could simply cross-examine the state's expert and accomplish the same goals; if the trial was continued they would have been assigned a new judge who was unfamiliar with the case, and she believed that the gunshot residue was not a huge issue in the case because of the small amount found and the lapse in time that occurred between the shooting and the testing for residue. *Id.* at 16-17. She was able to make those points through cross-examining the state's expert. *Id.* at 17.

Judge Caldwell addressed Johnson's claims regarding the absence of a gunshot residue expert in her Findings of Fact and Conclusions of Law. *See* Doc. 13-10, EX J, Finding of Fact Nos. 22-25, Conclusions of Law Nos. 11 and 12. Judge Caldwell noted counsel believed she was able to establish the crucial information about the gunshot residue evidence through cross-examination of the state's expert. Finding of Fact No. 25. Judge Caldwell concluded that under *Strickland* Johnson could not prevail unless he demonstrated the outcome of the trial would have been different had counsel moved for a continuance and called the expert to testify. Conclusion of Law No. 11. She further concluded counsel's decision to proceed without moving for a continuance was a strategic decision and that Johnson failed to show prejudice. Conclusion of Law No. 12. She believed counsel's cross-examination of the state's expert was sufficient. *Id.* Judge Caldwell found, therefore, that Johnson failed to prove either prong of the *Strickland* test.

The state habeas court decided trial counsel's failure to hire or consult with an expert was a strategic decision which did not rise to the level of ineffective assistance of counsel. The court cited *Strickland,* and noted when the claimed error is failure to hire an expert, the Petitioner cannot prevail unless he shows the outcome of his trial was prejudiced. While Johnson criticized trial counsel's failure to call an expert, he did not support the criticism with any specific expert testimony or opinions which would have changed the outcome of his trial. *See Ashker v. Class*, 152 F.3d 863, 876 (8th Cir. 1998); *Ellefson v. Hopkins*, 5 F.3d 1149, 1150-51 (8th Cir. 1993)(trial counsel's strategy to forego calling expert and rely on cross-examination of prosecution expert deemed not ineffective assistance of counsel). *See also Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (petitioner failed to show ineffective assistance because he did not demonstrate how his case was prejudiced by not retaining an expert; "[petitioner] offered no evidence that an . . .expert would have testified

on his behalf at trial. He merely speculates that such an expert could be found. Such speculation, however, is insufficient to establish prejudice . . . speculating as to what [an] expert would say is not enough to establish prejudice."). The state court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that this portion of Johnson's Second Ground for Relief be DENIED.

### (3)    Failure to Object to Admission of Pants Allegedly Worn By Johnson Into Evidence Without Foundation

Johnson asserts trial counsel should have challenged the pair of jeans that were received into evidence at trial and that tested positive for gunshot residue. HT (8-21-09) at 29. The jeans were seized pursuant to a warrant. The jeans came from the laundry basket from which Johnson was removing laundry to hang on the clothes line when officers arrived at the Monroe home on September 30. HT (8-21-09) at 49-50.

Johnson claims counsel should have attempted to keep the jeans out of evidence and/or argued his theory to the jury that he had not recently worn the jeans that were tested for gunshot residue, and that he was wearing different clothes the morning of the shooting. HT (8-21-09) at 29, 53. Counsel testified the jeans that were seized were size 38x32. HT (1-29-10) at 6. Johnson told her the jeans belonged to his niece. The niece, however, denied the jeans were hers; she did not own any men's jeans. *Id.* After the niece denied ownership, Johnson claimed the jeans could not have been his because the jeans that were seized and tested positive for gunshot residue were Tommy Hilfiger brand. Johnson claimed all his jeans were South Pole brand, purchased for him by his cousin. *Id.* at 7. Before counsel's office investigator could reach the cousin to confirm that version of Johnson's story, Johnson next claimed he had worn the Hilfiger jeans and had shot a gun while wearing them at some earlier time. *Id.* at 7. Johnson claimed he shot at hay bales while at his ex-in-laws' farm. The ex-in-laws, however, adamantly denied Johnson shot a gun while at their farm. *Id.* Johnson's ex-father-in-law claimed he did not "allow anybody to shoot anything" on his property. *Id.* at 8. Counsel chose not to challenge the admission of the jeans into evidence at trial.

Judge Caldwell addressed Johnson's claim regarding counsel's failure to object to admission of the jeans into evidence. *See* Findings of Fact and Conclusions of Law, Doc. 13-10, EX J. Finding of Fact Nos. 26-32, Conclusion of Law No. 14. Judge Caldwell concluded counsel's testimony regarding Johnson's constantly changing stories about the jeans was credible, and that her strategy to forego a challenge to the admissibility of the jeans into evidence was reasonable and not prejudicial. She found, therefore, that Johnson failed to meet either prong of the *Strickland* standard.

The Court must begin by presuming trial counsel was effective, and strategic choices are entitled to great deference. *Boyd v. Minnesota*, 274 F.3d 497, 502 (8th Cir. 2001). Federal courts may not second guess counsel's reasonable strategic decisions, as they are virtually "unchallengeable." *Cole v. Roper*, 623 F.3d 1183, 1191 (8th Cir. 2010). Further, "[c]redibility determinations are left for the state courts to decide; [federal courts] are not permitted to substitute [their] judgment as to the credibility of witnesses for that of the state court." *Graham v. Solem*, 728 F.2d 1533, 1540 (8th Cir. 1984) *quoting, Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 2262, 76 L.Ed.2d 794 (1983) and *Marshall v. Loneberger*, 459 U.S. 422, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). Johnson has offered no viable reason why the jeans were not admissible evidence at trial. A motion to exclude them from evidence, therefore, would have been futile. Failure to file a motion that has little chance of success fails to meet *Strickland's* deficient performance or prejudice requirements. *Hale v. Lockhart*, 903 F.2d 545, 549 (8th Cir. 1990).

Judge Caldwell found credible trial counsel's testimony about Johnson's changing and unreliable story of the origin of the Tommy Hilfiger jeans . This Court likewise finds counsel's testimony credible and her strategy to forego an attempt to challenge the admissibility of the jeans into evidence at trial reasonable and non-prejudicial. The state court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that this portion of Johnson's Second Ground for Relief be DENIED.

**(4)    Appeal Counsel Failed to Argue Johnson's Statements to Law Enforcement Should be Suppressed Because Johnson was Under the Influence of Prescription Drugs[10]**

During the state habeas hearing, Johnson testified that on the day of the shooting, he was taking Demerol and Darvocet. HT (8-21-09) at 34. Johnson was taking these medications to treat pain which resulted from a car accident which occurred in July, 2004. *Id.* Johnson told Detective Toft during interview process on September 30th that he was on Demerol and Darvocet because he was having headaches and "not feeling good." *Id.* at 35. He recalled he'd taken two Darvocet, two Demerol and two Celebrex for pain that morning. *Id.* During the state habeas hearing, Johnson also claimed that he's diabetic, that his blood sugar was at 500, that he was disoriented and that the video tape showed him having a seizure during the interview. *Id.* at 36. He did not believe trial or appellate counsel emphasized his medication enough as a reason to suppress his statements.

Detective Toft testified during the suppression hearing that Johnson was "very articulate, pretty smooth talker." Suppression Hearing January 5, 2005) (ST) at 40. Toft acknowledged during the suppression hearing that Johnson had taken pain medication the morning of the interview, but indicated he did not believe the drugs had any effect at all on Johnson's ability to comprehend what was happening. *Id.* at 50. Toft described Johnson as very coherent and intelligent during the interviews. *Id.* During the habeas hearing, Johnson indicated he thought counsel "should have looked into it more." HT (8-21-09) at 38.

Although Johnson asserts his appellate counsel "should have looked into it more," this issue was decided by the South Dakota Supreme Court on direct appeal. The Court affirmed the trial court's denial of Johnson's motion to suppress statements. *State v. Johnson*, 739 N.W.2d 1, 8 (S.D. 2007). As part of its decision, the Court determined that Johnson's statements were neither custodial nor involuntarily made. *Id.* at 11-12. The South Dakota Supreme Court considered the totality of the circumstances, including Johnson's age, intelligence, whether he was advised of his rights, the length of the detention, whether the questioning was repeated or prolonged, whether physical punishment or deprivation of food or sleep was part of the interrogation, and Johnson's previous

[10]This ground for relief is stated as Ground Number Four in Johnson's § 2254 Application.

experience with law enforcement. *Id.* at 11. The Court specifically noted that although Johnson informed Detective Toft he'd taken pain medication earlier in the morning, "there was no indication [Johnson] was impaired at the time of the interview." *Id.* at p. 12 fn.2.

At the state habeas hearing, trial counsel explained Johnson's claim continually changed regarding his medical issues the morning of the shooting. HT (1-20-10) at 9. Initially, Johnson told his counsel he was borderline diabetic, was having seizures, his blood sugar was too high, and that he'd taken Celebrex and Demerol. Next, Johnson told counsel his blood sugar was too low. *Id.* Later, he told counsel he'd taken two Darvocet, two Celebrex, and two Demerol. *Id.* Then he claimed he was taking Celebrex and something else that he could not remember. *Id.* at 10. Next he claimed he was not having blood sugar issues but was having seizures. *Id.* Then he claimed he'd taken eight Demerol or Darvocet. *Id.* Next, he claimed he'd taken sixteen Darvocet four extra-strength Tylenol, and two Celebrex. *Id.*

Johnson reviewed the taped interviews and identified two places on the tape where he believed he was having seizures. *Id.* Counsel sent the video tapes to a neurologist for review, but the neurologist saw no evidence of seizure activity and no evidence of drug overdose. *Id.* at 11.

Judge Caldwell addressed Johnson's claim that counsel was ineffective for failing to raise the effect of his prescription drug intake on the voluntariness of his statements. *See* Doc. 13-10, EX J, Finding of Fact Nos. 37-40, Conclusion of Law No. 15. Judge Caldwell found that contrary to Johnson's assertion, his appellate counsel did raise the issue on direct appeal, but the South Dakota Supreme Court decided it adversely to Johnson. Finding of Fact Nos. 39-40. As such, Johnson failed to prove either deficient performance or prejudice under *Strickland*. Conclusion of Law No. 15.

The United States Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515,

522, 93 L.Ed.2d 473 (1986).[11]  "We have interpreted *Connelly* to mean that the personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion brought to bear on the defendant by the State." *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (citation omitted, punctuation altered).

> A waiver of Fifth Amendment privilege against self-incrimination is valid if the waiver is made voluntarily, knowingly, and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). . . . . 'A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion or deception.' *United States v. Harper*, 466 F.3d 634, 643 (8th Cir. 2006). In order to determine whether a confession is voluntary, we look to the totality of the circumstances and must determine whether the person's will was overborne. *United States v. Castro-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007).
>
> Sleeplessness, alcohol use and drug use are relevant to our analysis but intoxication and fatigue do not automatically render a confession involuntary. *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990). Instead, the test is whether these mental impairments caused the defendants will to be overborne. For instance, we have upheld the conclusion that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his *Miranda* rights where police officers testified that they had no knowledge of these alleged impairments and the suspect did not act intoxicated. Similarly, we have upheld a district court's conclusion that a suspect who used methamphetamine the evening before and marijuana the day he waived his rights consented voluntarily because police officers testified he appeared sober and in control of his facilities.

*United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). The state court's factual findings are fairly supported by the record, and it did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that this portion of Johnson's Second Ground for Relief be DENIED.

---

[11]In addition to finding Johnson's statements voluntary under the totality of the circumstances, the South Dakota Supreme Court found "there is no indication that Johnson was coerced into making any statements through the inherently compelling pressures of a custodial setting . . ." *State v. Johnson*, 739 N.W.2d at 10 (citation omitted, punctuation altered).

**Petitioner's Third Claim for Relief:   Petitioner was not granted a fair trial because the Court refused to grant a change of venue.   The publicity was extensive.   The Sheriff made public speeches in the town concerning the Petitioner's guilt.**

Judge Severson held a motions hearing (PT) on February 10, 2005 (approximately four months before trial) regarding pre-trial publicity.   Counsel expressed concern that the media was sensationalizing the case and if the publicity did not stop, it would be impossible to pick an impartial jury in Minnehaha County.   PT at 4.   Judge Severson acknowledged  he must decide whether there was a "reasonable likelihood" pretrial publicity would prejudice the trial and if so, explore whether other available remedies (change of venue, trial postponement, a searching voir dire, jury instructions, sequestration) would mitigate the effects of the publicity.   PT at 10-11.   He indicated there had been no showing of a reasonable likelihood of prejudice.   *Id.* at 11.   He denied counsel's motion for an order to prohibit further publicity because he determined that whatever prejudice it caused could be addressed by alternative remedies.   *Id.*

Johnson's trial was ultimately held in Minnehaha County approximately eighth months after the shooting.   During jury selection, jurors were questioned individually about their recollection of the pretrial media coverage of the case, and whether it would affect their ability to be impartial.   *See generally* JT I, pp. 22-165.   Most jurors indicated either that they did not remember the media coverage or only had a vague memory of it.   *Id.*   A few jurors indicated they did not believe they could be impartial, and they were dismissed.   *Id.* at 30, 73.[12]

Johnson raised this claim in his state habeas proceedings.   At the state habeas hearing, Johnson explained that he believed the jury pool was influenced by pre-trial publicity.   HT (8-21-09) at 24.   He thought that Sheriff Milstead's appearance at the "Take back the night" rally on October 15th, 2004, during which Sheriff Milstead spoke of Cassandra's shooting,  indicating Johnson

---

[12]These jurors did not indicate their inability to be impartial was related to media coverage of the case.

23

committed the crime, was improper. *Id.* [13]   At the habeas hearing trial counsel explained as a general rule, not too many jurors remember news reports or what they have read in the paper about a case; because Johnson's trial was eight months after the crime, she believed the general rule held true in his case. HT (1-29-10) at 36-37.

In her Findings of Fact and Conclusions of Law (Doc. 13-10, EX J), Judge Caldwell noted Johnson's complaints about Sheriff Milstead's statements at the "Take back the night" rally. Finding of Fact Nos. 48-50. She concluded, however, that "pretrial publicity, standing alone, is insufficient to warrant a change of venue. . . .if knowledge of the pretrial publicity did not cause prejudicial opinion to be formed, a change of venue is unwarranted." Conclusion of Law No. 19. She also concluded that, given the thorough and individual voir dire and that Judge Severson excused those jurors who indicated an inability to be impartial, Johnson had failed to provide "any evidence which demonstrates that he was not given a fair and impartial trial and therefore has failed to show the trial court abused its discretion by denying the change of venue motion." Conclusion of Law No. 25.

The determinative inquiry regarding pretrial publicity is not the amount of publicity but the effect of the publicity on the prospective jurors. *Cox v. Norris*, 133 F.3d 565, 570 (8th Cir. 1998). Jurors need not be completely ignorant of the facts and issues surrounding the case; it is sufficient if they can lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Id.* Most importantly:

> As a federal court conducting habeas corpus review, we must defer to the state trial court's determination that the jury was not prejudiced by pretrial publicity. This determination is essentially a factual conclusion entitled to a presumption of correctness unless the state court hearing was procedurally defective or unless the federal court, on considering the record as a whole concludes that the factual determination is not fairly supported. Thus, the determination can only be overturned for 'manifest error.'

*Cox, id.* at 570.

---

[13]At the habeas hearing, Johnson testified the state grand jury did not issue its Indictment until October 18, three days after the "Take back the night" rally. HT (8-21-09) at 25. The state court records show, however that the grand jury issued its Indictment on October 13, two days before the rally. SR at 8-9.

The undersigned has thoroughly reviewed the transcripts of the motion hearing regarding pretrial publicity (PT) dated February 10, 2005, along with the transcript of Johnson's jury trial. The state courts' factual findings are fairly supported by the record, and they did not unreasonably apply clearly established federal law. It is therefore respectfully recommended to the District Court that of Johnson's Third Claim for Relief be DENIED.

## RECOMMENDATION

Petitioner's habeas corpus claims were adjudicated on the merits after an evidentiary hearing in state court where he was represented by court-appointed counsel. Petitioner has failed to satisfy his burden of rebutting the presumption of correctness of the state court's adjudication by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The state court determination was not contrary to, nor did it involve an unreasonable application of clearly established federal law *(Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)), and was a reasonable determination of the facts in light of the evidence presented in the state habeas proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner has failed to make a "substantial showing of the denial of a constitutional right." A certificate of appealability should not be issued in Petitioner's case. 28 U.S.C. § 2253(c)(2). Although 28 U.S.C. § 2253(c)(2) has been found to be "only a modest standard," Petitioner has not shown that "the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement or to proceed further.'" *Randolph v. Kemna*, 276 F.3d 401, 403 n.1 (8ᵗʰ Cir. 2002) (citations omitted).

Therefore, it is respectfully RECOMMENDED to the District Court that:

(1)     Respondent's Request to to Dismiss the Petition  (Doc. 13) be GRANTED;

(2)     A Certificate of Appealability should not be issued;

(3)     Petitioner's Application for Writ of Habeas Corpus (Doc. 1 )  be DISMISSED with prejudice.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black,* 781 F.2d 665 (8th Cir. 1986)

Dated this _11_ day of December, 2013.

BY THE COURT:

John E. Simko
United States Magistrate Judge